ACCEPTED
04-14-00678-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
3/9/2015 12:43:11 PM
KEITH HOTTLE
CLERK

## NO. 04-14-00678-CR

## IN THE COURT OF APPEALS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

3/9/2015 12:43:11 PM

KEITH E. HOTTLE
Clerk

## FOR THE

## FOURTH COURT OF APPEALS DISTRICT

## OF TEXAS

## SAN ANTONIO, TEXAS

**RONJEE MIDDLETON,**
**Appellant**

**VS.**

**THE STATE OF TEXAS,**
**Appellee**

**Trial Cause No. 2013-CR-0666**
**Appeal from the 227th District Court**
**Bexar County, Texas**
**Hon. Philip A. Kazen, Jr., Presiding**

## BRIEF FOR APPELLANT

**MICHAEL D. ROBBINS**
**Assistant Public Defender**
**Paul Elizondo Tower**
**101 W. Nueva St., Suite 310**
**San Antonio, Texas 78205**
**ORAL ARGUMENT**    **(210) 335-0701**
**REQUESTED**    **FAX (210) 335-0707**
**mrobbins@bexar.org**
**Bar No. 16984600**

**ATTORNEY FOR**
**APPELLANT**

i

## Identity of Parties and Counsel

Pursuant to TEX. R. APP. P. 38.1(a) (West 2015), the parties to this suit are as follows:

(1)     **RONJEE MIDDLETON,** TDCJ #01957579, Garza East Transfer Facility, 4304 Highway 202, Beeville, Texas 78102, is the appellant and was the defendant in trial court.

(2)     The **STATE OF TEXAS**, by and through the Bexar County District Attorney's Office, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205, is the appellee and prosecuted this case in the trial court.

The trial attorneys were as follows:

(1)     Ronjee Middleton was represented by **EDWARD F. SHAUGHNESSY,** 206 E. Locust St., San Antonio, Texas 78212.

(2)     The State of Texas was represented by **SUSAN D. REED,** District Attorney, and **THOMAS J. NISBET** and **STACEY A. ESTERAK,** Assistant District Attorneys, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205.

The appellate attorneys are as follows:

(1)     Ronjee Middleton is represented by **MICHAEL D. ROBBINS**, Assistant Public Defender, Paul Elizondo Tower, 101 W. Nueva St., Suite 310, San Antonio, Texas 78205.

(2)     The State of Texas is represented by **LAUREN SCOTT,** Assistant District Attorney, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205.

The trial judge was **HON. PHILIP A. KAZEN, JR.,** former judge of the 227th District Court. Judge Kazen has since retired. The new judge of the 227th District Court is **HON. KEVIN O'CONNELL**, Cadena-Reeves Justice Center, 300 Dolorosa St., 4th Floor, San Antonio, Texas 78205

# Table of Contents

                                                                        Page

Identity of Parties and Counsel .        .        .        .        .        .        .        .        ii

Table of Contents .        .        .        .        .        .        .        .        .        .        iv

Table of Authorities        .        .        .        .        .        .        .        .        .        vi

A Note Regarding Record References .        .        .        .        .        .        .        x

Statement Regarding Oral Argument .        .        .        .        .        .        .        x

Word Count .        .        .        .        .        .        .        .        .        .        .        x

Statement of the Case        .        .        .        .        .        .        .        .        .        1

Issues Presented        .        .        .        .        .        .        .        .        .        .        2

### FIRST POINT OF ERROR
The trial court erred when it overruled Mr. Middleton's objection to the jury shuffle requested by the State, because the shuffle violated Mr. Middleton's rights under *Batson v. Kentucky.* (RR 3, 35)

### SECOND POINT OF ERROR
The trial court erred when it denied the motion for mistrial, because Noel Smith's spontaneous reference that "It was the same cops that arrested us to our prior – our prior charge" cause irreparable damage to Mr. Middleton. (RR 4, 92).

### THIRD POINT OF ERROR
The trial court erred when it excluded the testimony of Misti Smith regarding Danielle Barron's possible intoxication, because the ruling had a substantial and injurious effect or influence in determining the jury's verdict. (RR 5, 32, 36, 48).

Statement of Facts .        .        .        .        .        .        .        .        .        .        3

Summary of the Argument        .        .        .        .        .        .        .        .        11

Argument . . . . . . . . . . . 13

    Appellant's First Point of Error (Restated) . . . . . 13

    Appellant's Second Point of Error (Restated) . . . . 24

    Appellant's Third Point of Error (Restated) . . . . . 30

Conclusion and Prayer . . . . . . . . . 41

Certificate of Service. . . . . . . . . 41

# Table of Authorities

Page

Constitution

U.S. Const. amend. XIV . . . . . . . . . 17

Statutes

Tex. Code Crim. Proc. art. 35.11 (West 2006) . . . . . 16

Tex. Code Crim. Proc. art 35.261 (West 2006) . . . . . 17

Tex. Penal Code § 22.02 (West 2011) . . . . . . 1

Rules

Tex. R. App. P. 9.4 (West 2015). . . . . . . . x

Tex. R. App. P. 33.2 (West 2015) . . . . . . . 32

Tex. R. App. P. 38.1 (West 2015) . . . . . . . ii

Tex. R. App. P. 44.2 (West 2015) . . . . . . .29,38

Tex. R. App. P. 77.3 (West 2015) . . . . . . . 19

Tex. R. Evid. 103 (West 2015) . . . . . . . . 32

Tex. R. Evid. 401 (West 2015) . . . . . . . .32,35

Tex. R. Evid. 402 (West 2015) . . . . . . . 2,35,36

Tex. R. Evid. 403 (West 2015) . . . . . . . *passim*

Tex. R. Evid. 404 (West 2015) . . . . . . .25,32,35,38

Tex. R. Evid. 608 (West 2015) . . . . . . . 32,35,36

TEX. R. EVID. 614 (West 2015) . . . . . . . 32,35,36

Cases

*Archie v. State*, 221 S.W.3d 695 (Tex. Crim. App. 2007) . . . . 29

*Barshaw v. State*, 342 S.W.32 91 (Tex. Crim. App. 2011) . . . . 39

*Batson v. Kentucky*, 476 U.S. 79 (1986) . . . . . *passim*

*Bausley v. State*, 997 S.W.2d 313 (Tex. App. – Dallas 1999, pet. ref'd). . 18

*Benson v. State*, 95 Tex. Crim. 311, 254 S.W. 793 (Tex. Crim. App. 1923) . 21

*Blanton v. State*, No. 74,214, 2004 Tex. Crim. App. LEXIS 2210 (Tex. Crim. App. June 30, 2004)(not designated for publication) . . . 19

*Burnett v. State*, 88 S.W.3d 633 (Tex. Crim. App. 2002) . . . . 39

*Castaldo v. State*, 78 S.W.3d 3454 (Tex. Crim. App. 2002) . . . 38

*Como v. State*, 557 S.W.2d 93 (Tex. Crim. App. 1977) . . . . 21

*Drylex Sys. v. Flores*, 1 S.W.3d 112 (Tex. 1999) . . . . . 33

*Emerson v. State*, 820 S.W.2d 802 (Tex. Crim. App. 1991) . . . 23

*Esteves v. State*, 849 S.W.2d 822 (Tex. Crim. App. 1993) . . . . 18

*Ethridge v. State*, No. 12-09-00190-CR, 2012 Tex. App. LEXIS 3110 (Tex. App. – Tyler Apr. 18, 2012, no pet.)(mem. op., not designated for publication) 20

*Ford v. State*, 73 S.W.3d 923 (Tex. Crim. App. 2002) . . . . 16

*Fuller v. State*, 827 S.W.2d 919 (Tex. Crim. App. 1986) . . . . 25

*Gigliobianco v. State*, 210 S.W.3d 637 (Tex. Crim. App. 2006) . . . 37

*Hawkins v. State*, 135 S.W.3d 72 (Tex. Crim. App. 2004) . . . . 29

*Hernandez v. State*, 127 S.W.3d 206 (Tex. App. – Houston [1st Dist.] 2003,
     pet. ref'd) . . . . . . . . . . 32

*Hill v. State*, 827 S.W.2d 860 (Tex. Crim. App. 1992) . . . . 17

*Jimenez v. State*, 307 S.W.3d 325 (Tex. App. – San Antonio 2009, pet. ref'd)
     . . . . . . . . . . . . .33,34

*Kemp v. State*, 846 S.W.2d 289 (Tex. Crim. App. 1992) . . . . 26

*Kipp v. State*, 876 S.W.2d 330 (Tex. Crim. App. 1994 . . . .26,27

*Ladd v. State*, 3 S.W.3d 547 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070
     (2000) . . . . . . . . .18,19,23,26

*McBride v. State*, 359 S.W.3d 683 (Tex. App. – Houston [14th Dist.] 2011,
     pet ref'd) . . . . . . . . . . 25

*Miller-el v. Dretke*, 545 U.S. 231 (2005) . . . . . .19,20

*Morales v. State*, 32 S.W.3d 862 (Tex. Crim. App. 2000) . . . . 39

*Ocon v. State*, 284 S.W.3d 880 (Tex. Crim. App. 2009) . . . . 26

*Perry v. State*, 236 S.W.3d 859 (Tex. App. – Texarkana 2007, no pet.) . 32,36,37

*Purkett v. Elem*, 514 U.S. 765 (1995)(*per curiam*) . . . . . 17

*Ramey v. State*, No. AP-75,678 (2009 Tex. Crim. App. Unpub. LEXIS 124 (Tex.
     Crim. App. Feb. 11, 2009)(not designated for publication), *cert. denied*,
     558 U.S. 836 (2009) . . . . . . . . . 19

*Reyna v. State*, 168 S.W.3d 173 (Tex. Crim. App. 2005) . . . . 32

*Reynolds v. State*, No. 03-10-00216-CR, 2010 Tex. App. LEXIS 9199 (Tex. App. –
     Austin Nov. 17, 2010, pet. dism'd)(mem. op., not designated for publication)
     . . . . . . . . . . . . . 20

*Rodriguez v. State*, No. 04-04-00230-CR, 2005 Tex. App. LEXIS 2959 (Tex. App. – San Antonio Apr. 20, 2005, pet. ref'd)(mem. op., not designated for publication)   .   .   .   .   .   .   .   .   .   33

*Saglimbeni v. State*, 100 S.W.3d 429 (Tex. App. – San Antonio 2002, pet.   ref'd)   .   .   .   .   .   .   .   .   .   .   .   .   36

*Sanders v. State*, 942 S.W.2d 3 (Tex. Crim. App.  1997)   .   .   .   .   16

*Sparks v. State*, 68 S.W.3d 6 (Tex. App. – Dallas 201, pet. ref'd)   .   .   23

*Stark v. State*, 657 S.W.2d 115 (Tex. Crim. App. 1983)   .   .   .   .   16

*Waldo v. State*, 746 S.W.2d 750 (Tex. Crim. App. 1988)(*en banc*)   .   .   26

*Watkins v. State*, 245 S.W.3d 444 (Tex. Crim. App. 2008), *cert. denied*, 555 U.S. 846 (846)   .   .   .   .   .   .   .   .   .   .   .   20

*Weatherred v. State*, 15 S.W.3d 540 (Tex. Crim. App. 2000)   .   .   .32.33

*Webb v. State*, 766 S.W.2d 236 (Tex. Crim. App. 1989)   .   .   .   .   34

*Wesbrook v. State*, 29 S.W.3d 103 (Tex. Crim. App. 2000)   .   .   .   39

*Williams v. State*, No. 02-13-00040-CR, 2014 Tex. App. LEXIS 1691 (Tex. App. – Fort Worth Feb. 13, 2014, no. pet.)(mem. op., not designated for publication) .   .   .   .   .   .   .   .   .   .   .   20

*Young v. State*, 137 S.W.3d 65 (Tex. Crim. App. 2004)   .   .   .   .   26

**A Note Regarding Record References**

In this brief, references to the eight-volume reporter's record will be thus: (RR 3, 45); and to the clerk's record will be thus: (CR, ___). Volume 8 of the reporter's record is the exhibits volume. References to this volume will be thus: (RR 6, SX___). Volume 7 was ordered sealed by the trial court.

**Statement Regarding Oral Argument**

The question of whether the rationale of *Batson v. Kentucky* should be extended to jury shuffles has not been definitively determined in Texas. For that reason, the undersigned counsel requests oral argument in this case.

**Word Count**

Pursuant to TEX. R. APP. P. 9.4(i)(1) & (i)(2)(B) (West 2015), the word count, from the beginning of the Statement of Facts until, but excluding, the signature block, is 9,578. The total word count is 11,850. The Appellate Public Defender's Office uses Microsoft Word 2010.

TO THE COURT OF APPEALS FOR THE FOURTH COURT OF APPEALS DISTRICT OF TEXAS:

This brief is filed on behalf of Appellant, Ronjee Middleton, by Michael D. Robbins, Assistant Public Defender.

## Statement of the Case

Appellant Ronjee Middleton was charged by indictment with the offense of aggravated assault with a deadly weapon.[1] (CR, 8). A jury was sworn (RR 4, 11), and Mr. Middleton pleaded not guilty. (RR 4, 16). Following evidence and arguments, the jury found Appellant guilty of aggravated assault with a deadly weapon as charged in the indictment. (CR, 199; RR 5, 86). Mr. Middleton elected that the jury assess punishment in case of conviction. (CR, 180). The jury found the enhancement allegation true, and assessed a sentence of 27 years (CR, 209; RR 6, 23). The trial court sentenced accordingly. (CR, 215-26; RR 6, 28). The court certified Appellant's right to appeal. (CR, 210), and Mr. Middleton timely filed notice of appeal. (CR, 211-213). This appeal follows.

---

[1] In violation of TEX. PENAL CODE § 22.02(a)(2) & (b) (West 2011). The State subsequently filed a notice of intent to use a prior conviction for enhancement of punishment (CR, 9-10), making this a felony of the first degree.

## Issues Presented

### Appellant's First Point of Error

The trial court erred when it overruled Mr. Middleton's objection to the jury shuffle requested by the State, because the shuffle violated Mr. Middleton's rights under *Batson v. Kentucky*. (RR 3, 35).

### Appellant's Second Point of Error

The trial court erred when it denied the motion for mistrial, because Noel Smith's spontaneous reference that "It was the same cops that arrested us to our prior – our prior charge" caused irreparable damage to Mr. Middleton. (RR 4, 92).

### Appellant's Third Point of Error

The trial court erred when it excluded the testimony of Misti Smith regarding Danielle Barron's possible intoxication, because the ruling had a substantial and injurious effect or influence in determining the jury's verdict. (RR 5, 32, 36, 38).

## Statement of Facts

**Shots fired outside a party house.**[2]

The events giving rise to this case occurred following the rather abrupt end of a party held in late October, 2012. The State's most lucid fact witness was **Danielle Barron**. Ms. Barron got off work at about 6:00 p.m. on October 27 and met up with Joey Gonzalez, her boyfriend at the time. (RR 4, 21). She received a text message during the evening from her friend Fernando,[3] inviting her to a party. The party was at the home of one of Fernando's friends that Ms. Barron did not know. (RR 4, 22). The party was at a house near Ray Ellison Drive and Dugas Street. Ms. Barron and Mr. Gonzalez arrived around midnight. (RR 4, 23). They parked on a side street behind the house. (RR 4, 24; RR 8, SX1). There were at least 30 people at the party, occupying the first floor of the house and the back yard. (RR 4, 25).

Ms. Barron was not drinking (RR 4, 27), but Mr. Gonzalez did drink, and became intoxicated. At some point, Ms. Barron heard a loud pop, which sounded like a gunshot, coming from the second floor of the house. The noise disturbed the people at the party. (RR 4, 28). Appellant Ronjee Middleton was at the party. Neither Ms. Barron nor Mr. Gonzalez knew him. He was sitting in a chair in a

---

[2] This brief summarizes the testimony of the State's witnesses as given at the trial. Appellant does not concede the truth of this testimony.

[3] Fernando's last name is not in the record.

corner of the dining room. When the loud pop from upstairs happened, Mr. Middleton stood up and "picked up" his pants, revealing a shiny gun. (RR 4, 29). The hostess of the party went to investigate the pop. She came back and said that it was a "party shot" and that no one needed to leave, although they could if they felt uncomfortable. Ms. Barron did not know what a "party shot" was. Mr. Middleton sat back down, but his gun made Ms. Barron nervous. (RR 4, 30).

Mr. Middleton was with Ms. Barron's friend Noel Smith. Ms. Barron and Mr. Gonzalez decided to leave the party after Fernando came down and said the party was ending. Mr. Gonzalez drank a lot of beer during the 45 minutes he and Ms. Barron were at the party. (RR 4, 31). He was rather intoxicated when they left the party and headed toward the car with another couple. Ms. Barron saw Mr. Middleton coming across the street. He asked where the people from the party were going. (RR 4, 32). Mr. Gonzalez responded. (RR 4, 33). Mr. Gonzalez did not get physical with Mr. Middleton, and he did not have a weapon. Mr. Middleton got angry during his conversation with Mr. Gonzalez. (RR 4, 34).

The conversation was about why the party was breaking up. Mr. Middleton asked Mr. Gonzalez whether they were going to party somewhere else, and Mr. Gonzalez said they were going to the South Side. Mr. Middleton got more aggravated. (RR 4, 35). Mr. Middleton pulled out his gun and told Mr. Gonzalez to stop being sarcastic. Ms. Barron told Mr. Middle to calm down, and that they were

just trying to leave. Mr. Middleton shoved Mr. Gonzalez in the face with his gun. This split Mr. Gonzalez's lip, and he started to bleed. (RR 3, 36). Noel Smith was five or six feet behind Mr. Middleton. (RR 4, 37). Mr. Barron asked Mr. Smith to try to calm Mr. Middleton down. However, Mr. Smith was "spaced out" and did not respond. (RR 4, 38).

Ms. Barron then heard gunshots. She looked up and saw that Mr. Middleton was shooting in Mr. Gonzalez's direction. One of the shots hit a car behind Mr. Gonzalez. Ms. Barron was terrified. (RR 4, 39). Ms. Barron recalled hearing five shots. She and Mr. Gonzalez were in the street when the shots went off. Mr. Middleton ran away, and Ms. Baron and Mr. Gonzalez ran toward her car. She asked Mr. Gonzalez if he was hurt. He did not say anything, but he was holding his left side. (RR 4, 40).

Mr. Gonzalez was silent and wide-eyed. Mr. Middleton was wearing a red jacket, a gray shirt, and a red and white banana. Ms. Barron told her friend Victoria to call the police. (RR 4, 41). The police arrived after about 10 minutes. The officer eventually took Ms. Barron and Mr. Gonzalez to a nearby convenience store for a show-up. Ms. Barron identified Mr. Middleton at the show-up. (RR 4, 42).

**Noel Smith** was a reluctant witness who appeared only because the State subpoenaed him. (RR 4, 66). Mr. Smith was best friends with Mr. Middleton, and attended the party with him. (RR 4, 67). The two of them, along with a friend

5

named Brandon, parked down the street. (RR 4. 68). They were in Brandon's car. (RR 4, 69). Mr. Smith knew that Mr. Middleton carried a gun, but he did not see his friend with a gun that night. (RR 4, 69-70). He did not recall whether Mr. Middleton wore a bandana. (RR 4, 70). They were chilling and mingling with the crowd. The party ended when a gunshot went off in the house. The girl who owned the house told them to leave. (RR 4, 71). Mr. Smith was not walking next to Mr. Middleton outside the house. He did not even see Mr. Middleton until after he heard shots fired. Mr. Smith was not standing near Danielle Barron. (RR 4, 72). However, Ms. Barron did yell at Mr. Smith to make Mr. Middleton stop. Mr. Smith did not know whether Mr. Middleton pulled out his gun. (RR 4, 73).

Mr. Smith was not carrying a gun that night. He was unaware that Mr. Middleton was outside near Ms. Barron. (RR 4, 75). Although Mr. Smith left the party in Brandon's car, Mr. Middleton left with a man named Martin. (RR 4, 76). Mr. Middleton drove Martin's car away from the party. (RR 4, 80). They all went to a gas station and convenience store on Highway 151. There were police officers at the convenience store. (RR 4, 85). The officers ended up detaining them and searching both cars. (RR 4, 93). They found a gun in Martin's car, which did not belong to Martin, Brandon, or Mr. Smith. (RR 4, 94).

**Jose "Joey" Gonzalez** was the named complainant in the case. (CR, 8). By his own admission, he was very intoxicated that night, having consumed 15 or 20

beers. When he and Ms. Barron left the party, they planned to go home. Someone they did not know approached them when they were walking outside the house toward the car.[4] (RR 4, 102). The person wanted to know where the party was. Mr. Gonzalez said it was on the South Side. (RR 4, 103). Mr. Gonzalez admitted that he answered in a sarcastic manner, making the man upset and aggressive. However, Mr. Gonzalez at no time threatened to man who approached them. The man took out a gun and pointed it at Mr. Gonzalez. He was three steps away, and Mr. Gonzalez backed off. (RR 4, 104).

Mr. Gonzalez was scared. The man hit him in the face with his gun. The assault cut Mr. Gonzalez's lip. Mr. Gonzalez stumbled backwards. The conversation did not become heated, which made the man's aggression all the more surprising. Mr. Gonzalez turned his head to cover his face. (RR 4, 105). He heard a gunshot, and started running toward the car. One of the bullets struck a car that he had fallen against. It struck the car while Mr. Gonzalez was standing against it. There were four or five shots, fired in Mr. Gonzalez's direction. (RR 4, 106). Mr. Gonzalez was not armed. (RR 4, 109). He did not know who assaulted him. (RR 4, 114). Mr. Gonzalez did not suffer a gunshot wound, and did not have any permanent or temporary disabilities as the result of the incident. (RR 4, 119).

---

[4] It should be noted – thankfully – that Danielle Barron was the driver. (RR 4, 101).

**Kayla Rogers Edgmon** was the greeter at the party, which occurred at her sister's house, but was actually hosted by her friend Fernando. (RR 4, 131). Ms. Edgmon did not hear anything unusual at the party, but she became aware that something out of the ordinary had occurred, and went to investigate. Her boyfriend Devon told her that fireworks had gone off. (RR 4, 132). The party went on, but a group of people showed up who gave her cause to have another conversation with Devon. There were three males and two female in the group. (RR 4, 133). The only one of them she recognized with Noel Smith. (RR 4, 133-134). Ms. Edgmon initially did not let this group in, until someone vouched for them. (RR 3, 134).

One of the men in the group carried a small black handgun. (RR 3, 135). Ms. Edgmon identified Ronjee Middleton as the person carrying the gun. She asked the group to leave, and they did so, 20 minutes after being asked. After they left, Ms. Edgmon heard multiple gunshots. (RR 4, 137). Ms. Edgmon was inside the house. She did not see the shooter. (RR 4, 138). She called 9-1-1 after hearing the shots, but she did not leave the house until after the police arrived. She was afraid that she would be shot. She later went to the convenience store near Highway 151. (RR 4, 140). She identified Mr. Middleton in a show-up at the store. She did not see Mr. Middleton fire his gun, but he did display it to her when she asked him to leave. (RR 4, 141).

**The forensic evidence.**

**Angela Salvatierra,** a crime scene investigator for the San Antonio Police Department (SAPD) arrived at the scene of the shootings at 2:10 a.m. on October 27, 2012. (RR4, 150-151). She also made a secondary location at a gas station, where she processed a car parked in the lot. (RR 4, 152). Ms. Salvatierra collected spent shell casings and a live round. (RR 4, 154). The shell casings were collected on Ellison Drive. The live round was removed from a weapon which she collected.[5] (RR 4, 157). The spent casings were Spear .380 automatic casings. (RR 4, 158).

Gunshot residue (GSR) tests were performed on Brandon Linson, Noel Smith, and Ronjee Middleton. (RR 4, 159). Ms. Salvatierra personally collected the GSR swab from Mr. Middleton. (RR 4, 160). A detective collected the swabs form the other two men. All were submitted to the Crime Lab. (RR 4, 161). The weapon she collected was a Bersa Thunder .380 firearm. (RR 4, 164). **Tammi Sligh**, a tool mark examiner at the Bexar County Crime Lab, testified that the spent rounds were fired by seized gun. (RR 4, 191). The gun in question is a deadly weapon. (RR 4, 192). **Michael V. Martinez**, a forensic scientist at the Crime Lab, tested the GSR kits submitted to him. (RR 5, 15-16). There was no GSR on either hand of Brandon Linson. (RR 5, 17). Nor was there GSR on either hand on Noel Smith. There was GSR on both hands of Ronjee Middleton. (RR 5, 18)

---

[5] The weapon, along with a bandanna, was collected from a car in the gas station parking lot.



(RR 4, 162).

**The verdict, punishment phase, and post-trial procedures**.

Following the reading of the charge and argument of counsel, the jury found Mr. Middleton guilty of aggravated assault with a deadly weapon, as charged in the indictment. (CR, 199; RR 5, 86). Nothing in the punishment phase is relevant to the issues in this appeal. Mr. Middleton elected that the jury assess punishment is case of conviction. (CR, 180). The jury assessed a 27-year term of imprisonment (CR, 209; RR 6, 23), and the trial court sentenced accordingly. (CR, 215-216; RR 6, 28). The trial court properly certified that this is not a plea bargained case, and Mr. Middleton has the right to appeal. (CR, 210). Mr. Middleton timely filed his notice of appeal. (CR, 211-213). The trial court appointed the Appellate Public Defender's Office to represent Mr. Middleton. (CR, 214). This appeal follows.

## Summary of the Argument

**First Point of Error.** At the start of jury selection, the State requested a jury shuffle, and the trial court shuffled the jury. The shuffle resulted in three black panelists, who were initially in the "strike zone" being placed further down the list and outside of the strike zone. Mr. Middleton, like the three jurors in question, is African-American. Defense counsel objected that the shuffle violated Mr. Middleton's rights under *Batson v. Kentucky*. The trial court overruled the objection. Although the Texas Court of Criminal Appeals has not endorsed the view that *Batson* applies to jury shuffles, it has not rejected it either. The possibility of a *Batson* challenge in this case was foreclosed by the State's action in shuffling the black panelists out of the strike zone. The shuffle denied Mr. Middleton the meaningful ability to be tried by a jury containing one or more black jurors. *Batson* should be extended to jury shuffles.

**Second Point of Error.** During Noel Smith's testimony, Mr. Smith referred to police officers encountered by him and Mr. Middleton at a convenience store later in the evening of the shooting. Mr. Smith spontaneously, and without prompting, said that "It was the same cops that arrested us to our prior – our prior charge." Defense counsel objected. His objection was sustained. Counsel moved for an instruction to the jury to disregard, which was granted. Finally, counsel moved for a mistrial, which was denied. The court erred when it denied the motion.

Mr. Smith's statement, which implied a prior arrest of himself and Mr. Middleton, his best friend, caused irreparable damage to Mr. Middleton's case.

**Third Point of Error.** On the first day of the trial, the defense invoked The Rule. Later, during a break after a couple of witnesses had testified, a lady named Misti Smith (Noel's wife) approached defense counsel and told him that she was a witness with potential relevant testimony. Defense counsel asked her to leave the courtroom. The following day, Ms. Smith told counsel that she had was at the party and saw Michelle Barron drinking liquor and using Ecstasy. Counsel made an offer of proof, and the courtroom bailiff testified that Ms. Smith told him the previous day that she would not be testifying, so he permitted her into the courtroom. The State objected to the proposed testimony, and the trial court sustained the objection. In so doing, the court denied Mr. Middleton a witness with relevant testimony, and the ruling had an injurious effect on the jury's verdict.

## Argument

### Appellant's First Point of Error (Restated)

The trial court erred when it overruled Mr. Middleton's objection to the jury shuffle requested by the State, because the shuffle violated Mr. Middleton's rights under *Batson v. Kentucky*. (RR 3, 35).

**Introduction.**

The State utilized a jury shuffle, a legal mechanism designed to assure that members of the jury venire were listed in random order, to destroy the original random order in which the panelists were selected, and thus created a situation in which three black panelists were removed from the top of the list and placed nearer to the bottom, outside of the strike zone. The Texas Court of Criminal Appeals has not extended *Batson* challenges to cover jury shuffles. This Point of Error will argue that the Court has not foreclosed the possibility, and that this is the case in which *Batson* should be extended.

**The State moves for a jury shuffle.**

Prior to the beginning of jury selection, the State moved for a jury shuffle, which the trial court granted. (RR 3, 8). Three African-American panelists were shuffled from low-numbered positions to high-numbered positions.[6] The defense objected to the shuffle, because it violated the defendant's rights as established under *Batson v. Kentucky*, 476 U.S. 79 (1986). (RR 3, 32). The defense requested

that the jury information sheets be preserved as a sealed exhibit. (RR 3, 33). Defense counsel named three African-American jurors,[7] who prior to the shuffle were Nos. 1, 10 and 23, and after the shuffle were Nos. 39, 46, and 49. (RR 3, 33). The trial court overruled the objection, but granted the defense request to seal and preserve the exhibit. (RR 3, 35-36).

Following the seating of the jury, and outside the presence of the jury, defense counsel renewed his objection and moved for a mistrial. He advised the court that the three African-American panelists were all shuffled out of the strike zone, which stopped at No. 33. The panelists in question became Nos. 39, 46, and 49. (RR 3, 108). The trial court overruled the objection and denied the motion for mistrial. (RR 3, 110).

**The sealed exhibit.**

Defense counsel tendered to the court the jury information cards, which were marked Defendant's Exhibit 1. Counsel observed that, "Obviously that exhibit is not intended to go before the jury." (RR 3, 32). The court agreed, and remarked that "the defendant's exhibit will be made part of the record." (RR 3, 33). Counsel argued the black jurors' positions during the objection to the jury shuffle (RR 3, 33-35), and the court overruled the objection (RR 3, 35).

---

[6] Mr. Middleton is African-American, as is obvious from the photograph of him taken at the time of his arrest and admitted into evidence. (RR 4, 44; RR 7, SX2).

[7] The undersigned counsel will not name any panelist or actual juror on this brief. He will instead refer to them by number.

The court and defense counsel (Mr. Shaughnessy) discussed the sealing of the record and the reason for doing so, as follows:

> MR SHAUGHNESSY: And, Your Honor, one other thing. Ordinarily, as the Court knows, juror information gets taken out of the record at the conclusion of the trial for various assorted reasons dealing with juror privacy. I would like the Court to make an exemption or an exception to that with respect to Defendant's Exhibit No. 1. Because ordinarily that would not find its way into the record just because it was utilized during Jury selection. But it's been admitted as an exhibit underneath – or with respect to our objection.

> THE COURT: Right. And so the physical copy that's now marked Defense 1 will remain with the court reporter and will not be taken up by the bailiff and then sealed by the clerk. So out of an abundance of caution what I would ask the – I don't know if there's a way to accomplish this, but we could take that up –

> MR. SHAUGHNESSY: The Court could make it a sealed exhibit I suppose.

> THE COURT: That's just what I'm going to do. So ordered.
> (RR 3, 35-36).

The idea of sealing and preserving the jury cards originated with defense counsel as a means to preserve them for the appellate record but keep them from going to the jury during deliberations. The trial court agreed with this solution, and it appears that everyone involved intended that the cards be available to the defense for appellate purposes on the *Batson* issue. The State did not object to the procedure.

At the appellate level, the undersigned counsel filed in this Honorable Court a motion to unseal the record. The Court abated the appeal and remanded the

motion to the trial court, which held an evidentiary hearing and ruled that counsel did not present good cause for unsealing the record. (Supp. CR, 31-33). This Honorable Court denied the motion to unseal the record. As a result, counsel applied for a writ of mandamus, filed under Appeal No. 04-15-00062-CR. The Court has denied the application.

**Jury shuffles.**

TEX. CODE CRIM. PROC. art 35.11 (West 2006) controls jury shuffles, providing in part: "The trial judge, on the demand of the defendant or his attorney, or by the State's counsel, shall cause a sufficient number of jurors from which a jury may be selected to try the case to be randomly selected from the members of the general panel drawn or assigned as jurors in the case." A jury shuffle is designed to insure that the list of jurors is random, and either party can ask for a shuffle. *Ford v. State*, 73 S.W.3d 923, 926 (Tex. Crim. App. 2002). It has been held that the right to a jury shuffle is absolute. *Stark v. State*, 657 S.W.2d 115, 116 (Tex. Crim. App. 1983); *see Sanders v. State*, 942 S.W.2d 3, 3-4 (Tex. Crim. App. 1997), although the denial of the right is subject to harm analysis. *Ford v. State*, 73 S.W.3d at 924-25.

***Batson* challenges.**

The State's purposeful use of peremptory strikes in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. *Batson v. Kentucky*, 476 U.S. 79, 84 (1986). The Texas Legislature enacted TEX. CODE CRIM. PROC. art. 35.261 (West 2006) to codify and implement *Batson* in Texas. *Hill v. State*, 827 S.W.2d 860, 863 (Tex. Crim. App. 1992).

Analysis of a *Batson* challenge to the State's use of peremptory strikes involves a three-step process. First, the defendant must make a *prima facie* showing that the State exercised peremptory strikes on the basis of race. This may be established "solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial . . . showing the [defendant] is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson*, 476 U.S. at 96. Once a defendant makes this showing, the State must come forward with a race-neutral explanation for striking the jurors in question. *Id*. at 97. A race-neutral explanation is one that, on its face, does not deny equal protection. *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (*per curiam*). Finally, if the State provides a race-neutral explanation for its strikes, the defendant must then rebut the State's explanation, show that the explanation was merely a

18

sham or pretext, or show that the State has exercised the strikes in a racially disparate manner. *Esteves v. State*, 849 S.W.2d 822, 824 n. 2 (Tex. Crim. App. 1993); *Bausely v. State*, 997 S.W.2d 313, 316 (Tex. App. – Dallas 1999, pet. ref'd).

**Batson and jury shuffles.**

No Texas appellate court has yet ruled that *Batson* applies to jury shuffles. The issue remains open to definitive resolution.

The "last word" on this question from the Court of Criminal Appeals was spoken in *Ladd v. State*, 3 S.W.3d 547 (Texas Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000). *Ladd* was a lengthy[8] death penalty appeal. One of the points of error was that "*Batson* naturally extends to [jury] shuffles." *Id.* at 563. The trial objection to the shuffle did not mention *Batson*, but "out of an abundance of caution," the trial court directed the prosecutor to explain his shuffle request, and then ruled that the reasons were not racially motivated. *Id.* at 564.

The Court of Criminal Appeals' ruling on the point of error was ambiguous and far from definitive: "Assuming *arguendo* that *Batson* extends to jury shuffles, we find no clear error in the trial court overruling of appellant objection." *Id.* The Court also dropped a footnote stating, in *dicta*, "One scholar has argued that, logically *Batson* should extend to jury shuffles. [Citation omitted] We wish to make it clear, however, that we do not endorse such a view." *Id.* at 563 n. 9. If the

---

[8] It contained 113 points of error. *Ladd v. State*, 3 S.W.3d at 555.

19

Court did not endorse such a view, it did not reject it out of hand, either, as may be seen from its "assuming, *arguendo*" language and analysis.

After *Ladd*, there is no Court of Criminal Appeal authority regarding the applicability of *Batson* to jury shuffles. The only two cases that even touch on it were unpublished and therefore not citable as legal authority TEX. R. APP. P. 77.3 (West 2015). *See Ramey v. State*, No. AP-75,678, 2009 Tex. Crim. App. Unpub. LEXIS 124 at *2-*5 (Tex. Crim. App. Feb. 11, 2009)(not designated for publication), *cert. denied*, 558 U.S. 836 (2009); *Blanton v. State,* No. 74,214, 2004 Tex. App. LEXIS 2210 at *29-*30 n. 17 (Tex. Crim. App. June 30, 2004)(not designated for publication).

The Supreme Court of the United States addressed the issue obliquely in *Miller-el v. Dretke*, 545 U.S. 231 (2005). *Miller-el* was a *Batson* case which addressed on a global scale an ongoing and historical pattern of racially discriminatory jury selection in the Dallas County. Consistent with that, the Supreme Court addressed jury shuffles as being one element in a pattern of keeping blacks from serving on Dallas County juries. After going to great lengths to compare the way the prosecutors treated black versus non-black panelists, the Court added, "The case for discrimination goes beyond these comparisons to include broader patterns of practice during jury selection. The prosecution's shuffling of the venire panel, its enquiry into views on the death penalty, its

questioning about minimum acceptable sentences: all indicate decisions probably based on race." *Miller-el*, 545 U.S. at 253.

The Court observed that the decisions to seek jury shuffles were in all probability used to manipulate the racial composition of the jury. *Id.* at 254-55. Following *Miller-el*, the Court of Criminal Appeals recognized that a jury shuffle is but one of several elements that may be considered in a traditional *Batson* challenge in a case where two African-American panelists were struck. *Watkins v. State*, 245 S.W.3d 444, 448-49 (Tex. Crim. App. 2008), *cert. denied*, 555 U.S. 846 (2008). The Texas intermediate appellate courts have uniformly declined to extend *Batson* to jury shuffles. *See Williams v. State*, No. 02-13-00040-CR, 2014 Tex. App. LEXIS 1691 at *2-*3 (Tex. App. – Fort Worth Feb. 13, 2014, no pet.)(mem. op., not designated for publication); *Ethridge v. State*, No. 12-09-00190-CR, 2012 Tex. App. LEXIS 3110 at *12 (Tex. App. – Tyler Apr. 18, 2012, no pet.)(mem. op., not designated for publication); *Reynolds v. State*, No. 03-10-00215-CR, 2010 Tex. App. LEXIS 9199 at *5 (Tex. App. – Austin Nov. 17, 2010, pet. dism'd)(mem. op., not designated for publication).

**Why *Batson* should apply to jury shuffles.**

There is a stark difference between the situations in *Miller-el* and *Watkins* and the situation in the present case. No African-American panelists were struck here. It is therefore impossible to make a standard *Batson* challenge. They were not

struck because they were eliminated in advance from being in a position where they were susceptible to being struck. To deny that *Batson* should extend to jury shuffles in the fact situation of this case is to potentially permit jury shuffles for reasons of keeping black people – or other groups that could be considered undesirable – off juries. While it is true that no reason need be assigned for a jury shuffle, *Como v. State*, 557 S.W.2d 93, 94 (Tex. Crim. App. 1977)(holding that the denial of a request for a jury shuffle was reversible error), it was also true prior to *Batson* that no reason needed to be assigned for a peremptory strike. *Benson v. State*, 95 Tex. Crim. 311, 314, 254 S.W. 793, 795 (Tex. Crim. App. 1923).

The previously unlimited discretion of the State in exercising it peremptory strikes was curbed slightly in an attempt to eliminate race-based abuse of that discretion. Race-based jury shuffles are a means of getting around the *Batson* rule. If there are only a few undesirable panelists, and if the few undesirable panelists can be shuffled away to the back of the courtroom beyond the strike zone, there is no need for a *Batson* challenge. Indeed, there is no possibility of a *Batson* challenge. The same result would have been achieved by other means. The legality of those other means remains up in the air. It is time for a definitive decision. The decision should be that *Batson* applies to jury shuffles.

**Application to this case.**

Appellant is not accusing the Bexar County District Attorney's Office of requesting a racially motivated jury shuffle. Appellant does not know what the prosecutor's motives were, because they are not reflected in the record. Because reducing the chances of having to strike black jurors by shuffling the jury was an obvious possibility, the trial court, after the defense objection, should have enquired on the subject and the State's attorney should have been required to offer an explanation. The trial court should then have been required to decide whether there was purposeful discrimination, as in the third stage of a *Batson* challenge.

Because the undersigned attorney does not have access to the sealed jury cards, it is not possible to show the composition of the remainder of the panel or of the panelists who the State (and defense) struck, although defense counsel requested that they be a sealed exhibit in support of his objection. (RR 3, 32). We do know that three black panelists whose original numbers were 1, 20, and 23, were shuffled into positions 36, 46, and 49. (RR 3, 33). There were a total of 62 people on the panel (RR 3, 34). The strike zone ended at number 33. (RR 3, 108) All three black panelists were inside the strike zone prior to the shuffle, but outside that zone afterwards.

The State's attorney was never called upon to give the reasons for his strikes, as was the case in *Ladd*, 3 S.W.3d at 564.[9] The only explanation offered by the State's attorney was that the shuffle was completely random, and the State was not striking anybody by means of the shuffle. (RR 3, 33, 109). While this is true, it ignores the obvious fact that the State did not like to original random placement of the panelists for some reason and obtained a random shuffle. The shuffle resulted in the black panelists going to locations where the State would not have to make strikes on them that were challengeable under *Batson*.

**Harm analysis.**

*Batson* issues are constitutional in nature. *Batson*, 476 U.S. at 84. They are generally not susceptible to harm analysis. *Sparks v. State*, 68 S.W.3d 6, 12 (Tex. App. – Dallas 2001, pet. ref'd). However, there is a question as to the proper remedy. In this case, the trial court did not engage in a *Batson* analysis at all, so it is impossible to determine whether its ruling was erroneous. The undersigned counsel believes that the appropriate remedy is analogous to the remedy announced in *Emerson v. State*, 820 S.W.2d 802, 804-05 (Tex. Crim. App. 1991): This Honorable Court should remand this case to the trial court for a proper *Batson* hearing.

---

[9] The reasons for the respective shuffles were also stated in several other cases declining to extend *Batson*. *Williams v. State*, 2014 Tex. App. LEXIS 1691 at *1-*2 (prosecutor's "gut" feeling, having nothing to do with race); *Ethridge v.State*, 2012 Tex. App. LEXIS 3110 at *14-*15 (State requested a challenge in every case).

The trial court erred when it denied the motion for mistrial, because Noel Smith's spontaneous reference that "It was the same cops that arrested us to our prior – our prior charge" caused irreparable damage to Mr. Middleton. (RR 4, 92).

**The offending statement.**

Noel Smith was an unwilling witness for the State. (RR 4, 66), He was also Mr. Middleton's best friend. (RR 4, 67). During direct examination, Mr. Smith talked about the encounter he and Mr. Middleton had at the gas station after the party. He testified that, while he was waiting in line to buy chips, Mr. Middleton was talking to the police officers present at the station. (RR 4, 85-86). Then, Mr. Smith said, spontaneously: "It was the same cops that arrested us to our prior – our prior charge. That's how we remembered them. But, you know – " (RR 4, 86).

The attorneys approached the bench, and the State's attorney advised the court that Mr. Smith's statement was not solicited. (RR 4, 86). The jury was excused. (RR 4, 87). The trial judge read back the testimony. (RR 4, 88). After some give-and-take between the attorneys and the court, defense counsel objected to the comment on extraneous conduct and to a motion in *limine* violation. (RR 4, 89-90). The trial court sustained the objection. Defense counsel asked for an instruction to the jury to disregard, which the court granted. (RR 4, 90). The jury returned to the courtroom, and the trial court instructed it to "disregard any testimony there may have been about any prior arrests occurring before the arrest

25

for the conduct which is the subject of this trial." Defense counsel then moved for a mistrial "on the basis of the testimony that was elicited from this witness [Mr. Smith] earlier." The trial court denied the motion. (RR 4, 92).

**The legal standards.**

TEX. R. EVID. 404(b) (West 2015) provides, in pertinent part, as follows: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person to show action in conformity therewith. It may, however, be admissible for other purposes [10]. . . provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction."

Mr. Middleton's counsel properly preserved error. Defense counsel must obtain an adverse ruling through successive objection, request for instruction to disregard, and if necessary motion for mistrial in order to preserve an issue for appeal. *McBride v. State*, 359 S.W.3d 683, 689 (Tex. App. – Houston [14th Dist.] 2011, pet ref'd)(citing *Fuller v. State*, 827 S.W.2d 919, 926 (Tex. Crim App. 1985)). In this case, there was an objection, followed by a request for an instruction to disregard, and a request for a mistrial. Counsel perused his objections until he received a negative ruling on his motion for mistrial. Therefore, all of the

---

[10] None of the listed purposes is relevant to this appeal.

prerequisites were met. Error was properly preserved. TEX. R. APP. P. 33.1(a) (West 2015).

**Mistrials – The general principles.**

A trial court's decision to deny a motion for mistrial is reviewed under an abuse of discretion standard. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). The trial court's ruling will be upheld if it is within the zone of reasonable disagreement. *Id.* "A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ladd v. State*, 3 S.W.3d at 567. However, when a defendant is faced with incurable harm, he is entitled to a mistrial, and if he is denied a mistrial, he will prevail on appeal. *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004). The appellate court presumes that the jury obeyed the instruction to disregard, and that the instruction cured any error. *Waldo v. State*, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988) (*en banc*). An instruction to disregard usually cures any error, unless the testimony was "clearly calculated to inflame the minds of the jury, or was of such damning character as to suggest that it would be impossible to remove the harmful impression from the jury's mind." *Kipp v. State*, 876 S.W.2d 330, 339 (Tex. Crim. App. 1994)(quoting *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992)).

**Application.**

Noel Smith was Ronjee Middleton's best friend. (RR 4, 67). They went to the party together (RR 4, 69), and left at the same time, although in different cars. (RR 4, 76). The evidence was conflicting about how close he was to Mr. Middleton when the shots were fired, but they were both outside the house in general proximity.(RR 4, 37, 72). They were presented as being partners in crime. Mr. Smith's gratuitous and uninvited declaration to the jury that he and Appellant had previously been arrested together by the same officers who they encountered at the gas station was undoubtedly of a "damning character." The trial court certainly considered it to be so, as evidenced by its instruction to the jury to disregard the testimony. The obvious impression that this testimony made on the jury was that Ronjee Middleton engaged in criminal conduct in this instance, because he had engaged in, and been arrested for criminal conduct in the past, in the company of the same person who was with him at the party. This is impermissible character evidence of the worst sort.

Vague references to extraneous offenses which do not specifically implicate the defendant are usually curable by an instruction to disregard. *See Kipp v. State*, 876 S.W.2d at 339. However, Noel Smith's declaration that the same officers arrested them on "our prior charge" was anything but vague. It was, instead, a specific reference to a prior offense for which Appellant was arrested in the

company of the same best friend who accompanied him in the present case. It is obvious from the record that Mr. Smith was an unwilling, perhaps hostile, witness. (RR 4, 66, 86). The implication is plain that he was trying his best to cover up any complicity in this case, and in doing so, he must have presented himself as an unattractive witness. The unattractiveness carried over into the statement about the prior joint arrest, and Mr. Smith brought Mr. Middleton down with him by implicating Mr. Middleton in a previous offense. Because of this, the court's instruction to the jury to disregard this testimony did not cure the harm, because it could not cure the harm. The jury convicted Ronjee Middleton, because it heard evidence that he was previously arrested in the company of his best friend, who company he continued to keep. This leads to the conclusion that, if he did it before, he must have done it this time. The evidence implied that this offense conformed with others, and with Appellant's character as a criminal.

The witness's remark was uncalled-for and was fatal to Mr. Middleton's case. It took even the prosecutor by surprise. (RR 4, 86). Considering all that was at stake when Mr. Smith made his surprise utterance, it is apparent that great harm was done and could not be undone by a limiting instruction. A continuation of the trial at this point was futile. The trial court abused its discretion when it denied the motion for mistrial.

**Harm analysis.**

In analyzing harm when a motion for mistrial is denied, the only "error" or "misconduct" to be considered is the court's denial of the motion. *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004). Error is not analyzed under TEX. R. APP. P. 44.2(a)(West 2015). *Archie v. State*, 221 S.W.3d 695, 699-700 (Tex. Crim. App. 2007). In analyzing harm, the court considers three factors: (1) the severity of the misconduct (prejudicial effect), (2) the curative measures taken, and (3) the certainty of conviction absent the misconduct. *Id.* at 700.

The prejudicial effect of Noel Smith's unwarranted comment was indeed severe. The jury was hearing evidence on whether Mr. Middleton fired shots in the street after the party, and it heard testimony from his best friend, who was there that night, that the two of the, had been arrested before for another offense. This indicates that the alleged shooting incident was not an isolated event, but was part of a continuing pattern of misconduct. The prejudicial effect of this statement is obvious. Admittedly, the court instructed the jury to disregard the statement (RR 4, 92), but the harm had been done, and it is difficult to see how the court's instruction could undo it. The stopper was out of the tub, and could never be replaced. The misconduct was severe and the curative measure was not sufficient. The court abused its discretion when it denied the request for a mistrial, and this Honorable Court should reverse the sentence and order a new trial.

The trial court erred when it excluded the testimony of Misti Smith regarding Danielle Barron's possible intoxication, because the ruling had a substantial and injurious effect or influence in determining the jury's verdict. (RR 5, 32, 36, 48).

**The excluded testimony.**

On the first day of testimony, September 17, 2014, defense counsel invoked The Rule[11] just prior to Danielle Barron's testimony. The trial court asked whether any witnesses other than Ms. Barron were in the courtroom, and the attorney for the State said that there were none. The trial court said, "No. Just keep an eye out for them, and we will swear them in and instruct them one at a time." (RR 4, 18).

The following day, after the State rested, but before the jury went to deliberate, defense counsel advised the court that he wished to present a witness named Misti Smith, but "there may be an issue as to whether or not a violation of the rule against sequestration was violated, and we need to take that up prior to the Court's ruling and the admissibility of the competency, I guess, of Ms. Smith as a witness." (RR 5, 28). Counsel advised the court that, during a break the previous day, Ms. Smith approached him and said she knew about what happened at the party and wanted to talk to him about it. Counsel told her that she could not listen to testimony, and sent her out in the hall. Counsel wished to present her testimony

---

[11] TEX. R. EVID. 614 (West 2015).

31

for the defense. (RR 5, 29). Counsel proffered her proposed testimony. (RR 5, 30-31).

Defense counsel advised the court that Ms. Smith arrived with Noel Smith before 9:30 a.m. She sat in the courtroom during the testimony of Danielle Barron and Noel Smith. The State objected to her testimony under Texas Rules of Evidence 614 and 403. (RR 5, 31). The trial court sustained the State's objection. (RR 5, 32). At the trial judge's request, the court bailiff took the stand and testified that when Ms. Smith entered the courtroom, he asked her if she was going to be a witness, and she said she was not. (RR 5, 33). The conversation occurred while Danielle Barron was on the stand. (RR 5, 34). Ms. Smith left the courtroom when Noel Smith, who she referred to as her husband, left the courtroom. (RR 5, 34-35). The court reiterated it ruling. (RR 5, 36).

Following the charge conference, and with the jury away, defense counsel put on Ms. Smith for an offer of proof. Ms. Smith testified that she arrived at the party with Mr. Middleton and Mr. Smith. They stayed inside the house until the party ended. (RR 5, 43). She spoke with Danielle Barron at the party, but did not otherwise know her. (RR 3, 43-44). Ms. Barron drank a lot of liquor at the party. (RR 5, 44). Besides drinking liquor directly from the bottle, Ms. Barron took two pills which Ms. Smith recognized as being Ecstasy. (RR 5, 45). While Ms. Smith heard the gunshot inside the house, she did not hear any outside. (RR 5, 45-46).

The State renewed its objections, citing Texas Rules of Evidence 401-404, 608, and 614. (RR 5, 47). The court again sustained the objection. (RR 5, 48).

**Preservation of error.**

Although defense counsel called the testimony a bill of exception (RR 5, 41), it lacked the formality to be an actual bill of exceptions. *See* TEX. R. APP. P. 33.2 (West 2015). Instead, this was simply an offer of proof, which was governed by TEX. R. EVID. 103 (West 2015). To be timely, and offer of proof must be made before the court's charge is read to the jury. TEX. R. EVID. 103(b) (West 2015). This was done in the present case, thus preserving the issue for review. *See Hernandez v. State*, 127 S.W.3d 206, 217 n. 14 (Tex. App. – Houston [1st Dist.] 2003, pet ref'd). Defense counsel did not argue that the court's ruling denied him the constitutional right to present a defense, so that will not be argued here. *See Perry v. State*, 236 S.W.3d 859, 864 (Tex. App. – Texarkana 2007, no pet.)(citing *Reyna v. State*, 168 S.W.3d 173, 179-80 (Tex. Crim. App. 2005)).

**Excluded evidence.**

An appellate court reviews a trial court's ruling excluding evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). A court abuses its discretion when its ruling lies outside the zone of reasonable disagreement. *Id.* "In addition, the appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was

made." *Id.* There are also more specific rules regarding the witness sequestration rule, which will be discussed below.

**"There are 10,000 legal rules, but only one that is called 'The Rule.'"** [12]

The legal rule known universally as The Rule is TEX. R. EVID. 614 (West 2015). With several exceptions not relevant to this appeal, The Rule provides:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.

"A violation of the Rule occurs when a nonexempt prospective witness … learns about another's trial testimony through discussions with persons other that the attorneys in the case …" *Drylex Sys. v. Flores*, 1 S.W.3d 112, 117 (Tex. 1999). [13]

The Rule provides for the exclusion of a witness from the courtroom during the trial. *Jimenez v. State*, 307 S.W.3d 325, 334 (Tex. App. – San Antonio 2009, pet ref'd). The Rule seeks to prevent corroboration, contradiction, and the influencing of a witness. *Id.* Once The Rule in invoked, a witness should not hear testimony or talk to anyone about the case without the court's permission. *Id.* The court's decision regarding a witness who has violated The Rule is discretionary. *Id.* The appellate court applies the following test to determine abuse of discretion:

---

[12] This is a quote, as close as the undersigned counsel can remember, from the Hon. Pat Priest, who spoke it to a jury in a case where one of the parties invoked The Rule. Unfortunately, counsel cannot recall which case it was.

[13] Although the cited case was a civil case, its holding applies in criminal cases also. *See Rodriguez v. State*, No. 04-04-00230-CR, 2005 Tex. App. LEXIS 2959 at *2 (Tex. App. – San Antonio Apr. 20, 2005, pet. ref'd)(mem. op., not designated for publication).

(1) if the rule was violated and the witness disqualified, were there particular circumstances, other than the mere fact of the violation, which would tend to show the defendant or his counsel consented, procured or otherwise had knowledge of the witness's presence in the courtroom, together with knowledge of the content of that witness's testimony; and (2) if no particular circumstances existed to justify disqualification, was the excluded testimony crucial to the defense[?]

*Id.* at 334-35 (citing *Webb v. State*, 766 S.W.2d 236, 245 (Tex. Crim. App. 1989).

**The evidence should have been permitted despite The Rule.**

There do not appear to be any circumstances of a conspiracy to evade The Rule in this case. Misti Smith was Noel Smith's wife. Noel was subpoenaed by the State, and he and his wife came to court together. (RR 5, 31-32, 34). She was unknown to defense counsel until she introduced herself to him, and he immediately asked her to leave the courtroom. (RR 5, 29). Apparently, nobody anticipated that she would be a witness in this case, including Ms. Smith herself. (RR 5, 33). Her presence in the courtroom was, if not accidental, in any case explainable. Defense counsel had no knowledge of her existence, much less of the contents of her testimony. Indeed, he did not learn about her proposed testimony until the following day. (RR 5, 29). When he told her to get out of the courtroom, she got out. Therefore, there were no circumstances that justified her exclusion.

Ms. Smith's proposed testimony would have impeached Michelle Barron's testimony by establishing that Ms. Barron, like her boyfriend Joey Gonzalez, was intoxicated and thus of questionable ability to observe in detail what happened that

night. Mr. Gonzalez readily admitted to being intoxicated. (RR 4, 102). Perhaps because of his intoxication, Mr. Gonzalez was unable to identify Mr. Middleton as the person who assaulted him. He could not even describe what the assailant was wearing. (RR 4, 114). Ms. Barron was the only witness who positively identified Mr. Middleton as being the assailant. (RR 4, 39). But, what if she was intoxicated? Would that have impeded her perception? The jury should have been permitted to consider this possibility, but the trial court prevented it. The testimony was crucial, in that evidence of her intoxication could come in from no other source. Perhaps the defense could have re-called her as a hostile witness and asked her about it, but her denial would have been just that, a denial. It would not have been crucial affirmative evidence of intoxication and diminished capacity. Only Misti Smith could have provided that.

**Addressing the State's other objections.**

In addition to invoking The Rule, the State's objection to the propose testimony also invoked Texas Rules of Evidence 608 and 401 – 404. (RR 5, 48). Therefore, those rules must also be addressed.

**TEX. R. EVID. 401** (West 2015) define relevant evidence as "evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The evidence that the State's primary witness might be

intoxicated bears on her ability to perceive what Mr. Middleton did or did not do on the street after the party. It is relevant to the determination of his guilt or innocence. **TEX. R. EVID. 402** (West 2015) simply states that relevant evidence is admissible unless otherwise provided by constitution, statute or rule.

**TEX. R. EVID. 608(b)** (West 2015) prohibits the use of specific instances of misconduct, other than the conviction of a crime, for the purpose of attacking a witness's credibility. There are limits on Rule 608, however. A jury is entitled to hear evidence on the mental status of a witness and the extent of his mental impairment. "Therefore, the right to cross-examination includes the right to impeach the witness with evidence that might go to any impairment or disability affecting the witness' credibility." *Perry v. State*, 236 S.W.3d at 865 (citing *Saglimbeni v. State*, 100 S.W.3d 429, 435 (Tex. App. – San Antonio 2002, pet. ref'd)). Available, relevant adverse evidence that might affect a witness's credibility is admissible to assist the jury in deciding the credibility of the witness. *Id.* at 867. If Ms. Barron was drinking a lot of liquor directly from the bottle and ingesting Ecstasy pills, her mental abilities were impaired. Although self-inflicted, this was still a disability which would affect her credibility. This evidence was admissible despite Rule 608(b).

**TEX. R. EVID. 403** (West 2015) provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion

of the issues, misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

An appellate court will balance several factors in making a Rule 403 analysis, including: (1) the inherent probative force of the proffered item along with (2) the proponent's need for the evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time of merely repeat evidence already admitted. *Perry v. State*, 236 S.W.3d at 867 (citing *Gigliobanco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006)).

In the present case, this evidence would have impeached the testimony of Ms. Barron by bringing into question her perceptive abilities, which would have been diminished somewhat if the jury had heard and believed the evidence. This would have been the only impeaching evidence other than through cross-examination, so there was a need for it, and it would not have driven a verdict on an improper basis. Far from distracting the jury from the main issue, it was completely relevant to the main issue. The jury would certainly have been equipped to weigh this straightforward evidence. The testimony would not have

taken much time, and would not have repeated anything already in evidence. Therefore, Rule 403 would not prevent this evidence from coming in.

With regard to character evidence under Rule 404(a), that Rule is limited with regard to a witness to the provisions of Rules 607, 608, and 609. The only one of which that is relevant is Rule 608, which has already been discussed. **TEX. R. EVID. 404(b)** (West 2015) prohibits the admission of evidence of other crimes, wrong or bad acts to prove the character of "a person," but provides that such evidence may be admissible for other purposes. The use of the term "a person" indicates that the Rule applies not only to defendants. *Castaldo v. State*, 78 S.W.3d 345, 349 (Tex. Crim. App. 2002). Among the expressed non-exclusive other purposes are opportunity and knowledge, and in this case the evidence would be admissible to show Ms. Barron's opportunity to soberly observe the events in question and to impeach her testimony about knowledge of the events. "The admissibility of evidence offered under the second sentence of Rule 404(b) will almost always involve a balancing under Rule 403." *Id.* at 350. As discussed above, a Rule 403 balancing test favors the admission of this evidence.

**Harm**

The exclusion of evidence in this case is subject to a non-constitutional error harm analysis. Non-constitutional error in the exclusion of evidence is reversible only if the appellant's substantial rights were affected. TEX. R. APP. P. 44.2(b)

(West 2015). An appellate court will not reverse a criminal conviction for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or influenced the jury only slightly. *Barshaw v. State*, 342 SW.3d 91, 93 (Tex. Crim. App. 2011)(citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). The focus is not whether the outcome of the trial was proper despite the error, but whether the error had a harmful or injurious effect or influence on the verdict. *Id.* at 93-94 (citing *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)). The conviction must be reversed if the appellate court has grave doubt that the result of the trial was free from the substantial effect of the error. *Id.* at 94 (citing *Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002)). "'Grave doubt' means that 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" *Id.*

Ms. Barron was the State's most important witness even though she was not the complainant. The complainant, Mr. Gonzalez, could not testify about who fired the shots, perhaps because he was so intoxicated. Ms. Barron was the only witness to say specifically that Ronjee Middleton fired the shots. There was not much in the cross-examination of Ms. Barron that impeached her, or could have impeached her. Defense counsel asked in passing whether anything other than beer was consumed at the party, and Ms. Barron said that no one at the party used drugs that

she knew of (RR 4, 48), and then the cross-examination went on to other issues. The most incriminating thing she said she saw at the party was a "beer pong" game, in which people apparently throw ping-pong balls into cups of beer and drink the beer of they succeed. (RR 4, 48, 50). The rest of the cross-examination was basically a re-hash of her direct testimony (RR 4, 50-57), and about her statement to the police detective. (RR 4, 59-60). Defense counsel's closing argument made the best of what he had. With regard to Ms. Barron, he argued that her testimony could not establish that the shots were fired at or in the direction of Mr. Gonzalez. (RR 5, 66-67). If there was evidence that Ms. Barron was drinking liquor and using Ecstasy, her testimony about the innocuous beer pong was not the whole truth, and the jury should have been permitted to test her credibility and ability to related detailed observations. This was not allowed, and as a result, the omission resulted in a harmful and injurious influence on the verdict. This Honorable Court should reverse the judgment of conviction and remand for a new trial.

## Conclusion and Prayer

WHEREFORE, PREMISES CONSIDERED, the Appellant prays the Court of Appeals to uphold the points of error, reverse the judgment of conviction and remand the case for a *Batson* hearing (First Point of Error), and remand the case for a new trial. (Second and Third Points of Error).

Respectfully submitted,


/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender
Paul Elizondo Tower
101 W. Nueva St., Suite 310
San Antonio, Texas 78205
(210) 335-0701
FAX (210) 335-0707
mrobbins@bexar.org
Bar No. 16984600
ATTORNEY FOR APPELLANT


## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Brief For Appellant has been emailed to Ms. Lauren Scott, Assistant District Attorney, Bexar County District Attorney's Office, Appellate Division, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205, on March 9, 2015.


/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender